UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| VISALUS, INC.<br><br>Plaintiff,<br><br>v.<br><br>QBE INSURANCE CORPORATION,<br><br>Defendant. | Case No. CV |

**COMPLAINT AND JURY DEMAND**

Plaintiff ViSalus Inc. ("ViSalus"), by and through its attorneys, as and for its complaint against Defendant QBE Insurance Corporation ("QBE") alleges as follows:

**NATURE OF THE CASE**

1. This lawsuit arises out of QBE's breach of its insurance coverage obligations to ViSalus in connection with two underlying lawsuits pending in this District (the "Underlying Lawsuits"): *Byrd et al. v. ViSalus, Inc. et al.*, No. 4:17-cv-12626-MFL-DRG ("*Byrd*") and *Gehart v. ViSalus, Inc. et al.*, No. 2:17-CV-12132-MFL-DRG ("*Gehart*"). Copies of the operative complaints in *Byrd* and *Gehart* are attached hereto as Exhibits 1 and 2.

2. ViSalus timely tendered the Underlying Lawsuits to QBE seeking defense and indemnity under a liability policy that ViSalus purchased from QBE,

Management Liability Policy No. QPL0376532 (the "Policy"). A copy of the Policy is attached hereto as Exhibit 3.

3. The Policy provides $5 million in "Directors & Officers and Entity Liability" coverage ("D&O coverage") on a "claims-made" basis, meaning that the Policy is triggered by suits filed against ViSalus and/or its directors and officers during the policy period from November 19, 2016 to November 19, 2017 (the "Policy Period").

4. The Underlying Lawsuits were filed against ViSalus and certain of its directors and officers during the Policy Period.

5. However, QBE denied ViSalus's request for coverage, contending that under the terms of the Policy, the Underlying Lawsuits are deemed to be claims first made years ***before*** the Policy Period as they purportedly arise out of the same or related facts at issue in a separate, earlier-filed lawsuit styled *Kerrigan et al. v. ViSalus et al.*, No. 2:14-cv-12693 ("*Kerrigan*") that is also pending in this District.

6. QBE's contention is baseless. The facts at issue in the Underlying Lawsuits did not occur until months ***after*** *Kerrigan* and are entirely distinct from and unrelated to the facts at issue in *Kerrigan*.

7. Judge Leitman, the judge presiding over all three suits—*Kerrigan*, *Byrd*, and *Gehart*—has confirmed as much, expressly distinguishing the facts and

injuries alleged in the Underlying Lawsuits from the facts and injuries alleged in *Kerrigan*.

8. Nor is Judge Leitman alone. Federal Insurance Company ("Federal"), another of ViSalus's insurers, also has confirmed that QBE's contention regarding the alleged relatedness of the Underlying Lawsuits and *Kerrigan* is without merit.

9. *Kerrigan* triggers coverage under an insurance policy issued by Federal.

10. Federal generally has acknowledged and honored its coverage obligations to ViSalus and its directors and officers in connection with *Kerrigan*, subject to certain reserved rights.

11. However, Federal has explained that its policy does not provide coverage for the Underlying Lawsuits precisely because the suits arise out of different, unrelated facts.

12. In short, everyone except QBE agrees that the Underlying Lawsuits represent independent, distinct claims, first made during the Policy Period.

13. Nevertheless, QBE steadfastly remains in breach of its contractual obligations, willfully ignoring the allegations in the Underlying Lawsuits that disprove its purported basis for denying ViSalus's request for coverage.

14. QBE's improper refusal to honor its coverage obligations to ViSalus has caused, and will continue to cause, ViSalus to suffer substantial monetary damages.

15. In addition, QBE's breach has impaired and prejudiced any opportunity ViSalus might have to resolve the Underlying Lawsuits by settlement.

16. Accordingly, ViSalus is entitled to a declaration of QBE's coverage obligations and an award of monetary damages.

**PARTIES, JURISDICTION, AND VENUE**

17. ViSalus is a multi-level marketing company that sells weight-loss and other related products directly to consumers and through a network of independent promoters.

18. ViSalus is a Nevada corporation. Its principal place of business is located in Troy, Michigan.

19. QBE is a commercial insurance carrier.

20. On information and belief, QBE is a Pennsylvania corporation with its principal place of business in New York, New York.

21. This Court has personal jurisdiction over QBE because QBE purposefully availed itself of the privilege of transacting business in Michigan, including through the sale of the Policy to ViSalus in Michigan, and because ViSalus's claims arise from QBE's activities in Michigan, including the issuance of letters improperly denying ViSalus's request for coverage in connection with the Underlying Lawsuits.

22. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000, excluding interest, costs, and attorneys' fees.

23. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because QBE is subject to specific personal jurisdiction in this district and a substantial part of the events giving rise to ViSalus's claims occurred here.

**THE POLICY**

24. The Policy includes several coverage "forms," some of which consist of separate "sides" of coverage that apply to different "Insureds" under different scenarios.

25. Relevant here, the Policy provides D&O coverage in the amount of $5 million per "Claim," subject to a self-insured "Retention" of $100,000 per Claim that must be paid by ViSalus.

26. The D&O coverage under the Policy consists of three "sides," two of which are triggered under present circumstances by the Underlying Lawsuits: (i) coverage for ViSalus for amounts ViSalus pays to defend and indemnify its directors and officers from liability for alleged "Wrongful Acts" ("Side B" coverage); and (ii) coverage for ViSalus to the extent ViSalus itself is alleged to have committed Wrongful Acts, irrespective of whether claims are also made against its directors and officers, ("Side C" coverage).

27. As to Side B coverage, QBE agreed it "shall pay, on behalf of [ViSalus], Loss on account of a Claim first made during the Policy Period to the extent [ViSalus] pays or indemnifies an Insured Person for such Loss."

28. The Policy defines "Insured" to include ViSalus and any "Insured Person," including "an Executive," which the Policy defines as "any natural person who was, now is or shall become: a duly elected or appointed director, officer, Manager … of any Company organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing."

29. With respect to Side C coverage, QBE agreed it "shall pay, on behalf of [ViSalus], Loss on account of a Claim . . . first made during the Policy Period."

30. As to both Side B and Side C coverage, the Policy defines "Loss" to include "the amount that an Insured becomes legally obligated to pay on account of any Claim," including compensatory damages, judgements and settlements and "Defense Costs," which the Policy defines as "that part of Loss consisting of reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses . . . incurred in investigating, defending, opposing or appealing any Claim . . . ."

31. Also as to both Side B and Side C coverage, the Policy defines "Claim" as, *inter alia*, "a written demand for monetary or non-monetary (including injunctive) relief . . ." and "a civil or criminal proceeding, evidenced by . . . the

service of a complaint or similar pleading in a civil proceeding . . . against an Insured for a Wrongful Act."

32. The Policy defines "Wrongful Act" as "(1) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an Insured Person in his capacity as such; or (b) by [ViSalus]; or (2) any other matter claimed against an Insured Person solely by reason of serving in his capacity as such."

33. The Policy contemplates that under limited circumstances, certain "Claims" shall be deemed "Related Claims." It defines "Related Claims" as "all Claims based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or Wrongful Acts."

34. And the Policy provides that "[a]ll Related Claims shall be deemed a single Claim first made during the policy period in which the earliest of such Related Claims was either first made or deemed to have been first made in accordance with" the Policy's reporting provisions.

### ***KERRIGAN v. VISALUS***

35. On July 9, 2014, three plaintiffs filed *Kerrigan*, a putative class action, against ViSalus and certain of its directors and officers, including Nick Sarnicola ("Sarnicola"), Blake Mallen ("Mallen"), and Ryan Blair ("Blair"). A copy of the operative Fourth Amended Complaint is attached as Exhibit 4.

36. The *Kerrigan* plaintiffs are former independent promoters of ViSalus who, in the words of Judge Leitman, "each paid money to [ViSalus] for the opportunity to sell ViSalus's weight-loss products," "lost the money that they paid to ViSalus," and "claim that ViSalus operates a pyramid scheme." No. 14-cv-12693, Dkt. 54 at 1.

37. The facts alleged in *Kerrigan* relate to the manner in which ViSalus allegedly marketed and represented its business opportunity to the plaintiffs and the manner in which ViSalus compensated plaintiffs and other independent promoters.

38. The *Kerrigan* plaintiffs seek damages for alleged civil RICO violations, securities fraud under federal law and Michigan blue-sky laws, violations of the Michigan Consumer Protection Act and Franchise Investment Law, unjust enrichment, and conversion.

39. Because the *Kerrigan* plaintiffs filed suit long before the Policy Period, ViSalus did not tender *Kerrigan* to QBE—ViSalus had not yet purchased the Policy from QBE when the *Kerrigan* plaintiffs filed suit.

40. ViSalus instead tendered *Kerrigan* to Federal seeking defense and indemnity under a D&O policy issued by Federal, Policy No. 8130-2100 (the "Federal Policy"), covering claims made during an earlier policy period.

41. Subject to certain reserved rights, Federal acknowledged various coverage obligations under the Federal Policy to ViSalus with respect to *Kerrigan*,

and Federal has reimbursed defense costs ViSalus has incurred in *Kerrigan*, depleting the limits of insurance coverage available under the Federal Policy.

***BYRD v. VISALUS***

42. On August 10, 2017, the *Byrd* plaintiffs filed a putative class action against ViSalus, Sarnicola, Mallen, Blair, and others.

43. Like the *Kerrigan* plaintiffs, the *Byrd* plaintiffs are former independent promoters of ViSalus.

44. However, none of the *Kerrigan* plaintiffs are putative class members in *Byrd*. The *Byrd* plaintiffs did not become independent promoters until ***after*** *Kerrigan* was filed. And they became promoters under different circumstances, allegedly giving rise to claims different from the claims at issue in *Kerrigan*.

45. As Judge Leitman has observed, the *Byrd* plaintiffs "claim that the Defendants defrauded them into purchasing equity" in ViSalus. (*Byrd*, No. 17-cv-12626, Dkt. 53 at 1.)

46. They allege having purchased this "equity" through an incentive program—the Founders Equity Incentive Plan (the "Plan")—that ViSalus began offering in 2015, over a year ***after*** the *Kerrigan* plaintiffs filed suit.

47. Contrary to the *Byrd* plaintiffs' allegations, units in the Plan are not stock in ViSalus. Rather, the Plan is a phantom equity program under which independent promoters qualified for "units" in the Plan by achieving certain metrics in ViSalus's compensation plan. The "units" in the Plan conveyed the

right to cash payments commensurate with a hypothetical ownership interest in ViSalus, with payouts to be made when any of the actual shareholders of ViSalus received a distribution.

48. Nevertheless, the *Byrd* plaintiffs claim that ViSalus, Sarnicola, Mallen and Blair (among others) misrepresented the nature and value of units in the Plan.

49. Based on these alleged facts—which are distinct from and unrelated to the *Kerrigan* plaintiffs' allegations that ViSalus operates a pyramid scheme—the *Byrd* plaintiffs assert eight claims, including claims for securities fraud under federal law and Michigan blue-sky law, conversion, and declaratory and injunctive relief, as well as monetary damages.

50. Because the *Byrd* plaintiffs first filed suit during the Policy Period, ViSalus tendered *Byrd* to QBE seeking defense and indemnity coverage under the Policy.

51. QBE denied ViSalus's request for coverage, asserting that *Byrd* and *Kerrigan* are Related Claims that arise out of a common nexus of facts in that both involve claims by plaintiffs who allegedly "paid money to become ViSalus 'producers' (sic) in the hope of becoming wealthy."

52. QBE acknowledged that "the specific ways the plaintiffs in each lawsuit believed they would become wealthy differed." But QBE posited such differences are immaterial to its (flawed) coverage analysis.

53. Having found *Byrd* to be "related" to *Kerrigan*, QBE deemed *Byrd* to have been filed when *Kerrigan* was filed in 2014—over a year ***before*** any of the facts at issue in *Byrd* occurred in 2015—and denied ViSalus's request for coverage on the grounds that *Byrd* was not a claim first made during the Policy Period.

***GEHART v. VISALUS***

54. On June 29, 2017, Michael Gehart ("Gehart") filed *Gehart* against ViSalus, Sarnicola, Mallen, and others.

55. In his complaint, Gehart alleged having suffered damages because ViSalus, Sarnicola and Mallen terminated an agreement purportedly allowing him to sell ViSalus products on the retail website Amazon.com.

56. Because Gehart first filed suit during the Policy Period, ViSalus tendered *Gehart* to QBE seeking defense and indemnity coverage under the Policy.

57. QBE responded acknowledging the potential for coverage under the Policy and its duty to defend ViSalus, Sarnicola and Mallen, subject to payment by ViSalus of the $100,000 per-Claim self-insured Retention, which ViSalus would pay by funding the defense until it had incurred $100,000 in defense costs.

58. Shortly thereafter, QBE advised ViSalus that it objected to the rates charged by ViSalus's defense counsel—the same counsel handling ViSalus's defense in *Kerrigan*.

59. QBE refused to credit defense costs ViSalus incurred and paid at these rates—rates to which Federal had readily agreed in *Kerrigan*—as eroding the

Retention and instead unilaterally sought to impose substantial, unreasonable caps and discounts on defense counsel's rates.

60. ViSalus disputed that defense counsel's standard rates were unreasonable, explaining that ViSalus itself had agreed to pay and paid the same rates for years, and further that Federal also had agreed to pay and paid the same rates in connection with *Kerrigan* entirely without protest, confirming that the rates are entirely reasonable.

61. QBE ignored the evidence confirming the reasonableness of defense counsel's rates and refused to honor its obligation under the Policy to fully fund the defense, breaching the terms of the Policy providing that QBE "shall have the right and duty to defend any Claim" triggering Side B or Side C coverage.

62. Notwithstanding the dispute, ViSalus did not immediately sue QBE. ViSalus instead postponed taking action to see whether QBE would maintain its position when ViSalus exhausted the Retention and began seeking reimbursement of its defense costs from QBE.

63. ViSalus continued to provide updates to QBE regarding defense costs incurred while exhausting the Retention.

64. On information and belief, in or about May or June 2018, it became clear to QBE that ViSalus soon would exhaust the Retention, even using the unreasonably low rates QBE sought to impose on ViSalus and defense counsel.

65. QBE then decided to change its coverage position to avoid its obligations to ViSalus.

66. Contemporaneously, Gehart amended his complaint, copying allegations from *Byrd*, adding new claims based on the Plan, and adding Blair as a defendant.

67. Like the *Byrd* plaintiffs, Gehart specifically alleged that ViSalus, Sarnicola, Mallen and Blair misrepresented the nature and value of units in the Plan and that such misrepresentations caused him to suffer monetary damages.

68. QBE seized the opportunity presented by Gehart's amended complaint to revise its position and deny ViSalus's request for coverage for *Gehart* outright.

69. QBE advised ViSalus that it had determined *Gehart* and *Kerrigan* also are Related Claims, which are deemed under the Policy to be a single Claim first made when *Kerrigan* was filed, long before the Policy Period.

**COUNT I**
**DECLARATORY JUDGEMENT**

70. ViSalus incorporates by reference the preceding allegations as if fully set forth herein.

71. The Underlying Lawsuits constitute Claims against ViSalus for Wrongful Acts, triggering Side C coverage under the Policy.

72. And ViSalus has agreed to defend and indemnify Sarnicola, Mallen and Blair—all of whom are Insured Persons under the Policy—from liability for

the alleged Wrongful Acts at issue in the Underlying Lawsuits, thereby triggering Side B coverage under the Policy.

73. The Underlying Lawsuits are Related Claims as both *Byrd* and *Gehart* are based on allegations of misrepresentations relating to the Plan.

74. However, the Underlying Lawsuits are not “related” to *Kerrigan*, as they do not arise out of the same or related facts, circumstances or Wrongful Acts as *Kerrigan*.

75. The claims in *Kerrigan* arise out of, and are based on facts relating to the way ViSalus allegedly represented its business opportunity and compensation for its independent promoters.

76. The *Kerrigan* plaintiffs claim that ViSalus is a pyramid scheme, and its “hook” is “the lure of lots of money for getting others in the door, then for those others to do the same on down the line, each new recruit paying for the right to recruit others.” (Exh. 4 ¶ 1.)

77. The *Kerrigan* plaintiffs allege that their injuries stemmed from being misled into believing they would “make money by selling the ViSalus product” when, in reality, they “needed to recruit others in order to make money.” (*See id.* ¶¶ 15–16.)

78. By contrast, the claims in *Byrd* and *Gehart* have nothing to do with the organizational structure of ViSalus or how it compensates distributors, *i.e.*, whether ViSalus is a pyramid scheme—the core facts on which *Kerrigan* is based.

79. *Byrd* instead arises out of the allegation that ViSalus defrauded the plaintiffs into purchasing equity in ViSalus—facts that are not alleged in *Kerrigan*, based on events that occurred ***after*** *Kerrigan* was filed.

80. Indeed, the Plan did not exist when the *Kerrigan* plaintiffs filed suit and none of the *Byrd* plaintiffs had enrolled as independent promoters of ViSalus when the *Kerrigan* plaintiffs filed suit.

81. Attorneys for the *Byrd* plaintiffs have explained that "the *Byrd* plaintiff class and Gehart" assert "claims not available to the *Kerrigan* class, claims that arose after that suit was filed and ***based on different wrong doing***." No. 2:14-cv-12693, Dkt. 189 at 6 (emphasis added).

82. Judge Leitman has explained that the *Byrd* "[p]laintiffs do not allege that they were hurt by the operation of the pyramid scheme described in *Kerrigan*; they allege that they were injured by the misstatements and omissions that led them to investing in the Plan. And [the *Byrd*] [p]laintiffs allege that ***their injuries arose out of their investment in the Plan, not from the continuation of the pyramid scheme***." No. 17-cv-12626, Dkt. 53 at 25–26 (emphasis added).

83. Federal agrees. Out of an abundance of caution, ViSalus also tendered the Underlying Lawsuits to Federal and asked Federal to advise whether QBE was right—whether the Underlying Lawsuits and *Kerrigan* are Related Claims such that the Federal Policy provides coverage for the Underlying Lawsuits too.

84. Federal responded confirming that QBE is wrong—the Underlying Lawsuits are distinct, independent, unrelated claims first made during the Policy Period. They do not arise out of the same or related facts, circumstances or Wrongful Acts, as counsel for the *Byrd* plaintiffs and Judge Leitman have explained.

85. Yet QBE refuses to honor its coverage obligations to ViSalus under the Policy in connection with the Underlying Lawsuits.

86. ViSalus timely tendered the Underlying Lawsuits to QBE, asking QBE to acknowledge its obligations to defend and indemnify ViSalus, Sarnicola, Mallen and Blair.

87. And ViSalus has incurred and paid $100,000 in defense costs in connection with the Underlying Lawsuits, satisfying its Retention under the Policy.

88. In this and every other respect, ViSalus duly performed its obligations under the Policy.

89. Accordingly, QBE is obligated to pay all Loss incurred on account of the Underlying Lawsuits, including all Defense Costs.

90. QBE has refused and failed to acknowledge this obligation, forcing ViSalus to commence this action.

91. Such refusal confirms the existence of an actual, justiciable controversy between the parties as to QBE's obligations under the Policy—a controversy that must be resolved now to prevent ViSalus from suffering existing

and continuing prejudice, including but not limited to uncertainty in the control of, and/or the inability to implement settlement strategies during the course of the Underlying Lawsuits.

92. ViSalus is entitled to a judgment from this Court declaring that QBE is obligated to pay all Loss incurred by ViSalus on account of the Underlying Lawsuits.

**COUNT II**
**BREACH OF CONTRACT**

93. ViSalus incorporates by reference the preceding allegations as if fully set forth herein.

94. At all relevant times, ViSalus has performed its obligations under the Policy, which constitutes a valid and enforceable written contract between QBE and ViSalus.

95. QBE thus is obligated to pay all Loss incurred by ViSalus on account of the Underlying Lawsuits, including all Defense Costs.

96. QBE has materially breached this obligation by failing and refusing to defend and indemnify ViSalus.

97. As a direct and proximate result of QBE's material breaches, ViSalus has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

ViSalus requests the following relief:

a. A money judgment in the amount of ViSalus's actual damages;

b. A judgment declaring that QBE is obligated to pay all Loss incurred by ViSalus on account of the Underlying Lawsuits, including Defense Costs;

c. An award of attorneys' fees, costs and expenses incurred in this action, as allowed by law;

d. An award of all interest on the above amounts as allowed by law, including pre- and post- judgment interest;

e. Such other and further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.

Dated: August 20, 2018

Respectfully submitted,

By: /s/Nicholas B. Gorga
Attorney for Plaintiff ViSalus, Inc.

QUARLES & BRADY LLP

Kevin D. Quigley (AZ Bar #015972)
Edward A. Salanga (AZ Bar #020654)
Brian A. Howie (AZ Bar #026021)
Michael S. Catlett (AZ Bar #025238)
*All Admitted to Practice in ED MI*
One Renaissance Square
2 North Central Avenue
Phoenix, AZ 85004
Telephone Number: (602) 229.5200
kevin.quigley@quarles.com
edward.salanga@quarles.com
brian.howie@quarles.com
michael.catlett@quarles.com

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Nicholas B. Gorga (P72297)
Andrew W. Clark (P79165)
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
Telephone Number: (313) 465-7640
Fax Number: (313) 465-7641
ngorga@honigman.com
aclark@honigman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

By: /s/ Nicholas B. Gorga
Attorney for Plaintiff ViSalus, Inc.

QUARLES & BRADY LLP

Kevin D. Quigley (AZ Bar #015972)
Edward A. Salanga (AZ Bar #020654)
Brian A. Howie (AZ Bar #026021)
Michael S. Catlett (AZ Bar #025238)
*All Admitted to Practice in ED MI*
One Renaissance Square
2 North Central Avenue
Phoenix, AZ 85004
Telephone Number: (602) 229.5200
kevin.quigley@quarles.com
edward.salanga@quarles.com
brian.howie@quarles.com
michael.catlett@quarles.com

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Nicholas B. Gorga (P72297)
Andrew W. Clark (P79165)
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
Telephone Number: (313) 465-7640
Fax Number: (313) 465-7641
ngorga@honigman.com
aclark@honigman.com